We'll hear argument first this morning in Case 10-277, Wal-Mart Stores v. Dukes. Mr. Boutros. Mr. Chief Justice, and may it please the Court, the mandatory nationwide class in this case was improperly certified for two fundamental reasons. First, plaintiffs failed to satisfy Rule 23a's cohesion requirements as reflected in the commonality, typicality, and adequacy requirements of the rule. Second, plaintiffs' highly individualized claims for monetary relief failed to satisfy Rule 23b-2's requirements for certification of a mandatory non-opt-out class. Regarding Rule 23a, because the plaintiffs' claims in this case hinge on the delegation of discretion to individual managers throughout the country, they cannot meet the cohesion requirements that are reflected in Rule 23a. The delegation of discretion in some ways is the opposite of cohesive claims that are common to everyone in the class. The common policies that the plaintiffs point to are either neutral and not argued to be discriminatory, or they are affirmatively nondiscriminatory. The company has a very strong policy against discrimination and in favor of diversity. Roberts, I suppose if corporate headquarters had learned that the subjective decision-making or the delegation of decision-making to the field was resulting in several discriminatory practices or a pattern of discrimination, in other words, the decentralized process was leading to discrimination, then I suppose the company is the head that could be attributed to the policy adopted by headquarters? No, Your Honor. I think that in this situation, if there was a pattern, for example, at a particular store, where the decision-making would be. Roberts, no, I'm talking about, sir, they've got thousands of stores and, you know, every week they get a report from another store saying, you know, there's an allegation of gender discrimination. At some point, can't they conclude that it is their policy of decentralizing decision-making that is causing or permitting that discrimination to take place? I think that would be an inquiry, Your Honor. I don't think it would rise to a pattern or practice or a common policy that affects everyone in the same way. Certainly, companies do look at the situation throughout the company and seek to root out discrimination, but it would take more than some reports, especially in a company that has so many stores and so many units. And here, the plaintiff's claims simply aren't typical. If the three-name plaintiffs stand before the Court, they are supposed to represent 500,000 or a million or more people and stand in judgment. That's the words the Court used in Hansberry v. Lee to represent all those other people. And the claim is that the individual decision-makers in those other cases exercised their discretion in a way that was biased, and there's no proof of that. Kennedy, the Chief Justice's question reminds me somewhat of our rule in Monell under 1983. A city is not liable for a 1980 constitutional violation unless it has a policy. Would you think that we could use that as an analog to determine whether or not there is a common question here? Yes, Your Honor. I think the analog is that if a company had a policy, a general policy of discrimination, as opposed to here where it's a general policy against discrimination, and it was, in the words of the Court in Feeney, saw patterns throughout the company and because of sex, because of gender, continued to allow the patterns to exist, that would raise a different question. Suppose following the Monell analog, there's a showing of deliberate indifference to the violation. Would that be a policy? Your Honor, I think deliberate indifference raises a different question. Under a disparate treatment claim, again in Feeney, the test would be was the company allowing the discrimination to occur because of gender, because it wanted there to be discrimination. There's no evidence of that here. Ginsburg's is there any responsibility if you the numbers are what has been left out so far, the company gets reports month after month showing that women are disproportionately passed over for promotion, and there is a pay gap between men and women doing the same job. It happens not once, but twice. Isn't there some responsibility on the company to say, is gender discrimination at work, and if it is, isn't there an obligation to stop it? Your Honor, yes, there is an obligation to ensure for a company to do its best to ensure there are not wage gaps in discrimination. But here, for example, if one looks at the aggregated statistics that the plaintiffs have pointed to, it points to a completely different issue. It does not show that there were gender gaps at the stores among comparable people. That's really the fundamental flaw in their case. Their argument is that individual decisionmakers throughout the country were making stereotype decisions and that that had a common effect, but they just added everything together. They haven't shown a pattern across the map. They've added all the data together and pointed to disparities, some which mirror some of the statistics that the plaintiffs had. Sotomayor, I thought their expert didn't aggregate them together. He did it regionally, not store by store, as your expert did, number one. And number two, that he performed, as accepted by the district court and affirmed by the circuit court, any number of controlled variable comparisons, including job history, job ratings and other things, and found that the disparity could not be explained on any of the normal variables that one would expect, and that the disparity was significantly much higher than the 10 competitors of Wal-Mart and what they were paying their labor force. So what is speculative about that, number one? And two, why is that kind of statistical analysis inadequate to show that a policy of some sort exists? Justice Sotomayor, first, the plaintiff's expert did a national regression and then simply estimated the regional results. He did not do a regional regression. But even if he had, these statistics go more to the merits. We think we have strong arguments on the merits responding to those statistical arguments, but. Sotomayor, that begs the legal question, which is, you're right, ultimately you may win and prove to a fact finder that this analysis is fatally flawed. But what the district court concluded was that on the basis of your expert, whom he discounted because your expert was basing analysis on premises that were not based on premises that the court found not acceptable, that there was enough here after a rigorous analysis. What's the standard that the court should use in upsetting that factual conclusion? Your Honor, the district judge did not discount Wal-Mart's expert. The district court found that it wasn't the stage at which to make a determination between the two. The standard that we think would govern would be the standard that the Second Circuit adopted in the IPO case, which says there needs to be a choice. When you're talking about discretionary decision around the country by different decision-makers, there has to be some demonstration that there's a common effect throughout the system. Our expert's report and testimony showed that at 90 percent of the stores, there was no pay disparity. And that's the kind of — and even putting that aside, the plaintiffs needed to come forward with something that showed that there was this miraculous recurrence at every decision across every store of stereotyping, and the evidence simply doesn't show that. The other problem on the cohesion analysis is, again, the typicality inquiry. Each of the plaintiffs have very different stories. One of them was promoted into a managerial position. One was terminated for disciplinary violations. One was promoted and then had a disciplinary problem and then was demoted. In each of these cases, if this were an individual case, they would have to show that they were treated differently than people who were situated just like them, with the same supervisor, the same department, the same situation. Alito, what do you think is the difference between the standard that the district court was required to apply at the certification stage on the question whether there was a company-wide policy and the standard that would be applied on the merits? At the certification stage, Justice Alito, the plaintiffs did not have to prove that there was an actual policy of discrimination and that that was the company's policy. But they at least needed to point to a policy that was common and that linked all these disparate individuals, disparate locations and different people together. And their argument is that the common policy is giving tens of thousands of individuals discretion to do whatever they want. That is not commonality, it's the opposite.  Well, I don't think that's quite fair, Mr. Boutros. I think that their argument was that the common policy was one of complete subjectivity, was one of using factors that allowed gender discrimination to come into all employment decisions. And in Watson, we suggested that that was a policy, a policy of using subjective factors only when making employment decisions. That's exactly the policy that was alleged here. Justice Kagan, they do not argue that it was an entirely subjective process. As the Court suggested in Falcone, entirely subjective would be a different issue. They argue that it was excessive subjectivity and that there were general overarching company standards that exerted control. On page — I think it's page 13 of their brief, they say the discretion was unguided. Three pages later, they say it was guided by these nondiscriminatory policies. So it's really an incoherent theory that does not have posed the kind of situation you're suggesting. I guess I'm just a little bit confused as to why excessive subjectivity is not a policy that can be alleged in a Title VII pattern and practice suit or in a Title VII disparate impact suit. Your Honor, in Watson, the Court did suggest, did state and hold that subjective decisionmaking could be challenged in a disparate impact case. But Justice O'Connor's opinion went on to say there needs to be the identification of a specific practice within that policy. As the Court said in Falcone, Title VII does not govern policies, it governs practices. And subjectivity is not a practice if it were a policy. And there was a — like most companies, Walmart has a combination of objective and subjective standards. Within that, the plaintiffs, if they had pointed to some particular criteria, people with a great personality, they're going to — they're the ones we're going to push up. And they were trying to tie that to a disparate impact or disparate treatment. Ginsburg. There was a case, it was in the 70s, and it was a class action against AT&T for, I think, promotion into middle management. What was at issue there was a test part objective, but then in the end, the final step was a so-called total person test. And women disproportionately flunked at that total person. And the idea wasn't at all complicated. It was that most people prefer themselves. And so a decisionmaker, all other things being equal, would prefer someone that looks like him. And that was found, that total — the application of that total person concept was found to be a violation of Title VII. This sounds quite similar. I mean, it's not just that it's subjective. You have the expert. I know you have some questions about that expert. But the expert saying that gender bias can creep into a system like that simply because of the natural phenomenon that people tend to feel comfortable with people like themselves. Your Honor, this is not like the total person test, but I think that is a very good example of something that could be a practice inside the overarching policies. And if you had a case where a particular decisionmaking unit applied the total practice test and you had disparate results in that particular unit, that group of people could have a much stronger case for a class action. But as Your Honor points out, the sociologist here, who is the glue that's supposed to hold this class together, said he couldn't tell if stereotyping was occurring one-half of 1 percent or 95 percent or at all. And this is a class action. The question here is whether that we can assume that every decisionmaker acted in the same manner, in a way that had, in this Court's words, the same injury, because the plaintiffs had the same interest and the same injury. That's the way the Court put it in Amchem. By their own expert accepting all of their proof, the answer is no. That assumption is not supported by the record. That's why there's not the kind of cohesion that's necessary to protect the rights of the absent class members and the defendant. The other thing that's not supported by the record is that the plaintiffs would have to demonstrate discrimination in every individual case, and that's never been the law. All that the plaintiffs have to demonstrate, and especially at this stage in the proceedings, is that there is a practice, a policy of subjectivity that on the whole results in discrimination against women, not that each one of these women has to be a woman in the class, with themselves discriminated against. That's correct, Your Honor. At the phase one, we're not arguing that a plaintiff would have to come forward and show that every class member was discriminated at that point. Under the Teamster's analysis, there must be proof of a standard operating procedure of discrimination. Here, it's undisputed that Walmart's policy, and it wasn't just a written policy, it was implemented and enforced rigorously, that was anti-discrimination. But, Your Honor, you're correct that each person doesn't have to come forward in phase one. The big — the other big problem here is that the district judge said in phase two under Teamster's, Walmart would not be entitled to put on its individual defenses. Women who thought they had a claim would not be able to come forward if, in this process, the paper records suggested they didn't have a claim, and come into court and have their day in court and argue that they should be compensated. The plaintiffs are trying to cut off half of the Teamster's framework, which is fundamental both to due process and to Title VII, because Title VII's section 706G states very clearly that only victims of discrimination may recover. Roberts. Roberts. What happens to the damages claim of an individual woman who is part of this class if that class prevails? If the class prevails, then the claim would be resolved in this — in this manner under — it's very unclear what the district court had in mind. Would she be eligible for only back pay or compensatory damages as well? Yes, Your Honor. She would only be eligible for back pay. The plaintiffs retained their compensatory damages claims for themselves, but waived those for the class members in order to get a class certified, which I think is a fundamental crucial violation. Would the woman with the claim for compensatory damages be able to sue that after the class prevails in this case? Our view is that she would not be, because that would have been part of the core nucleus of facts in the case. Even though she could have not received notice and not had an opportunity to opt out? That's the problem. That goes to the problem with this B-2 certification, that this case, if it were going to be certified at all, needed to be looked at under Rule 23b-3. Rule 23b-3 was — was created for precisely this sort of circumstance, the growing edge of the law, where individualized monetary claims are at stake. The language of Rule 23b-2 speaks of injunctive and declaratory relief. I thought that your position was that this could not be certified under Rule 23b-3 either. Is that correct? Our view is that the plaintiffs will not be able to satisfy those provisions, but that's why they brought it under Rule 23b-2, to circumvent the procedural protections of superiority, predominance, and the like. Sotomayor, would that bar the B-2 class? Meaning, if their claim is, as they stated, that they are seeking injunctive and declaratory relief against a discriminatory impact or case or a pattern and practice case, wouldn't that have value? And wouldn't that value be standing alone without the damages component? B, that the plaintiffs who come in later have a presumption that discrimination affected them and the burden shifts to Walmart to prove that there was a nondiscriminatory reason? There certainly could be a benefit from an injunction if the plaintiffs met all the standards. The problem here is that the individualized damage claims, the back pay claims, engulf and overwhelm the injunctive relief. Sotomayor, even if they did, why couldn't you separate out the B-2 issue from the B-3 question of whether monetary damages have enough common facts and law to warrant a certification under B-3? Your Honor, some courts have done that, looked at the injunctive relief claims under the B-2 standard and the monetary reliefs under a B-3 standard. That can raise other complications, especially here the plaintiffs are seeking punitive damage as well. But that's at least a possibility. It would certainly be better than this, shoehorning these monetary relief claims that are so individualized. Sotomayor, would you address the – address them separately for me and tell me why a B-2 class couldn't exist only on injunctive relief? And if it can, if you're conceding it can, then is your attack merely that the monetary component of this, the back pay, which, you know, I know the dispute on whether that's equitable relief or compensatory relief or not, why that just can't be separated out and put into the B-3? Your Honor, our view is that the injunctive relief claim still has significant problems concerning cohesion, adequacy, typicality, commonality. On the adequacy point, this case includes at least 544 store managers who are alleged to be discriminators and victims. If that's not a conflict under AMCAM and the adequacy test in Hansberry v. Lee, I don't know what is. The women who are compelled to be in the class, they can't opt out. They are current employees, they are former employees, they are cut across every position in the country, and there is no demonstration that they are being affected in a common way. So I think there would still be those commonality, typicality, cohesion problems because of the nature of the plaintiff's case here, the notion of the common policy being given discretion in independent judgment.  Well, correct me if I'm wrong, but I thought that the district judge said that the absent class members would get notice and have an opportunity to opt out. So a plaintiff, a member of the class who wants to go for compensation instead of just back pay, could opt out. The district court, Justice Ginsburg, limited that ruling to the punitive damage claim. And the Ninth Circuit made clear it was viewing it that way. It said under its ruling, which sent punitive damages back, that would simplify things because then there wouldn't have to be notice and an opportunity to opt out under back pay. And back pay is monetary relief for individuals. To bind people, based on a balancing test under B-2, to a judgment to which they were not a party in, Taylor v. Sturgill, this Court talked about the fundamental rule, that an individual is not bound by a judgment to which they are not a party, and said we need crisp rules with sharp corners in this area, where such a fundamental right is at stake. That's why we think it needs to be Rule 23b-3 when individual monetary relief is at stake. Sotomayor, that begs my question. Are you talking about any monetary relief? You're claiming, I'm assuming, that monetary relief includes equitable relief. Yes, Your Honor. Sotomayor, the Fifth Circuit has described a test where it doesn't use the predominant question, it uses the incidental test. What's wrong with that test? That test is much better than the test that was applied below. The plaintiffs have walked away from the two tests that were applied in the lower courts. They have never contended they could meet the incidental damages test. And under the Fifth Circuit's test, the Allison case, only automatic back pay that would qualify for that, here this is individualized relief. That's where I'm going to. Would you accept that incidental test as appropriate to the question of when monetary damages predominate or don't? Your Honor, the text of Rule 23b-2 is very clear. It talks about injunctive and declaratory relief. The only ambiguity that's created is from the advisory committee note, and as this legislative history did try to create ambiguities, the other parts of the advisory committee notes make very clear that the drafters were concerned about the historical antecedents where it was an injunctive-only case to desegregate and the like. I think the drafters of Rule 23b-2 would have been shocked if they had learned that this case that involves millions of claims for individualized monetary relief were being sought to be included in a b-2 class. That said, Your Honor, the incidental damage test is, I think, far superior because it's at least clearer and would be closer to a sharper bright-line rule which is required in this context. I'd like to go back briefly to the point I made earlier about individual relief and taking away the rights of both Walmart and the absent class members. The procedures that would be used here, the Ninth Circuit proposed a statistical sampling method. The plaintiffs do not defend that. They do not mention the Halao case, which was the cornerstone of the Ninth Circuit's ruling, which would allow sort of a prediction about who might have been hurt, how many people might have been hurt, and then a divvying up of monies based on that. The district court precluded the fundamental Teamsters hearings, which would allow once a presumption, if one was to arise, of discrimination occurred in a pattern of practice, would allow the defendant to then show that it didn't discriminate on an individual basis. And it would allow the individuals to come in and have their day in court. That violates Title VII, it violates the Rules Enabling Act, and we think it really shows some of the core flaws in this case. Roberts, what if the class does not prevail, it loses? Does that bar an individual woman at a particular Walmart from bringing these same claims? Yes, Your Honor. There's a presumption in the world of class actions, there's two that I think the plaintiffs are relying on. One is that class actions are always good, and the bigger the class action, the better, and that the class will win. None of those presumptions can be counted on. If the plaintiffs lose and they adhere their compensatory damages claims, I think would be gone because the named plaintiffs are asserting them. If they tried to bring a case as pattern or practice or pay or promotion, there would be significant questions of res judicata and collateral estoppel. And it's not fair to anyone to put this all into one big class. But you are not suggesting that they would be precluded on individual discrimination claims, are you? No, Your Honor. If they had individual claims that were separate from the nucleus of operative facts, Your Honor, that might pose a different question. But what if it were the same theory, that the reason this person was able to discriminate was because he had total subjective discretion in his hiring? Then there would be a real problem of collateral estoppel or res judicata, Your Honor. Mr. Chief Justice, I would like to reserve my remaining time for rebuttal. Thank you, counsel. Thank you. Mr. Sellers. Justice, may it please the Court, this case follows from the Teamsters and Watson models of theories of discrimination. And as a consequence, there is no requirement to have a formal policy of discrimination here. What would the injunction look like in this case? The injunction would look like a series of remedial measures that would direct Walmart to provide for detailed criteria by which to make pay and promotion decisions that are job-related in a way that hasn't been true up until now. It would provide for it to hold managers accountable for the decisions they make. It would ensure effective oversight of the of these pay and promotion decisions in a way that the company had, while the company did have, by the way, information regularly submitted to it about pay decisions, it took no action and it did not effectively monitor, allowed these problems to fester. Are, is it your position that on this scale, subjective decision-making processes are necessarily illegal? No, not at all, Mr. Chief Justice. So if this were, how many stores are we talking about, 1,000 stores? Several thousand stores. Several thousand stores. How many examples of abuse of a subjective discrimination delegation need to be shown before you can say that flows from the policy rather than from bad actors? I assume with 3,000, however many thousands of stores, you're going to have some bad apples. Well, Mr. Chief Justice, we have examples in the record. As Teamsters. No, no, I know there are examples. How many do you need to have? Surely it won't be if somebody sends one letter in saying the guy at this plant is discriminating, plant, this store is discriminating. That can't be enough to support your theory. That's correct. We don't submit that. There is no minimum number that this Court has ever set. Teamsters, as an example in Teamsters, the Court had before it about 40 examples but significantly they weren't required in order to establish a pattern or practice of liability. And we have more than that, of course, but in order to establish a pattern or practice of liability, or at least a prima facie case, Teamsters holds that what you need to do is show that there were disparities sufficiently substantial to create an inference of discrimination with respect to a discrete practice. Is it true that Wal-Mart's pay disparity across the company was less than the national average? Mr. Chief Justice, the position — I don't know that that's a fair comparison. The position that Wal-Mart has advanced makes no — the comparison it makes is with the general population, not with people in retail. Wal-Mart's obligation under Title VII is to ensure that its managers do not make pay decisions because of sex. And the comparison that's relevant is between men and women at Wal-Mart, not the general population that includes people in retail, but includes railroad workers and all kinds of other people. That's not the appropriate comparison. Kennedy. Kennedy. It's not clear to me, what is the unlawful policy that Wal-Mart has adopted under your theory of the case? Justice Kennedy, our theory is that Wal-Mart provided to its managers unchecked discretion in the way that this Court's Watson decision addressed that was used to pay women less than men who were doing the same work in the same facilities at the same time, even though those women had more seniority and higher performance and provided fewer opportunities for promotion than women because of sex. It's hard for me to see that's a — your complaint faces in two directions. Number one, you said this is a culture where Arkansas knows, the headquarters knows everything that's going on. And in the next breath you say, well, now these supervisors have too much discretion. It seems to me there's an inconsistency there. I'm just not sure what the unlawful policy is. Well, Justice Kennedy, there is no inconsistency any more than it's inconsistent within Wal-Mart's own personnel procedures. The company provides to its managers this discretion, which, by the way, is very discreet. It is not the broad kind of — we're not attacking every facet of the pay and promotion decisions. The district court found specific features of the pay and promotion process that are totally discretionary. There's no guidance whatsoever about how to make those decisions. But with respect to the discretion, every store the district court found is provided — managers are provided with the same level of discretion. But the company also has a very strong corporate culture that ensures that managers — not just with respect to the practices we're challenging, but in all respects, what they call the Wal-Mart way. And the purpose of that is to ensure that in these various stores, that contrary to what Wal-Mart argues, that these are wholly independent facilities, that the decisions of managers will be informed by the values the company provides to these managers in training. Well, is that disparate treatment? It is disparate treatment. It is a form of disparate treatment because they are making these decisions because of sex. And they are — and they're doing so with — we have evidence that we think through the stereotyping evidence we have here, as well as the statistical results. I don't — I'm getting whipsawed here. On the one hand, you say the problem is that they were utterly subjective. And on the other hand, you say there is a strong corporate culture that guides all of this. Well, which is it? I mean, it's either the individual supervisors are left on their own, or else there is a strong corporate culture that tells them what to do. Well, Justice Scalia, there is this broad discretion given to managers. Right. But they do not make these decisions in a vacuum. They make the decisions within a company where they are — So there's no discretion. Is that what you're saying? No, I'm not. I'm suggesting they are given this discretion, but they are informed by the company about how to exercise that discretion. So it's effectively saying — If somebody tells you how to exercise discretion, you don't have discretion. Well, all right. That's another — it's certainly a — the bottom line is they didn't. And the results show it. There was consistent disparities in every one of the regions, 41 regions. What do you do about the unchallenged fact that the central company had a policy, an announced policy, against sex discrimination, so that it wasn't totally subjective at the managerial level? It was you make these hiring decisions, but you do not make them on the basis of sex. Wasn't that the central policy of the company? No. That was a written policy. That was not the policy that was effectively communicated to the managers. And that's — Now, how is that established here? Well, what we have, as I said before, is evidence of, for instance, at the Sam Walton Institute, where every manager has to be trained before they become a manager, they provide as a question, a response to a standard question, why are women so underrepresented or few women in management? And the response given was because men seek advancement or are more aggressive in seeking advancement. Now, that's a typical, stereotypical statement provided to every person going through the management training program, that they then go off and inform — that informs their decisions when they make — when they have this discretion to make promotions. And that causes them intentionally to discriminate on the basis of sex. That's — that is — That cause — how could that possibly cause them to intentionally discriminate on the basis of sex? Well, they — they have — they have an intent to take sex into account in making their decisions. That is — that is, they apply a stereotype about — that women are less aggressive when it comes to assessing their suitability for promotions. It seems to me that's — that's just an assessment of why the percentages differ, and they differ not only — not only at Wal-Mart, but at — at — throughout the industry. To say that that's the explanation is not to tell your people don't promote women. Right. If you have an aggressive woman, promote her. I understand that. And there were — there have been women promoted. But Justice Scalia, first of all, I — we think that that is — the questions you are raising are ones that Wal-Mart can raise at trial. The question at this juncture is whether there are questions common to the class. We've identified what has been recognized as a common policy, that there's no dispute this policy applies throughout the company. And the fact that we at this juncture are — I mean, we have — and we have shown, as we think we have to in order to satisfy commonality, that there are disparities adverse to women, and we have the means to show through the testimony of Dr. Bielby and other evidence that we can provide this — connect these two to evidence common to the class. Scalia. And do you think you've sufficiently shown, despite the fact of an explicit, written, central policy of no discrimination against women, do you think you've sufficiently shown that that policy is a fraud, and that what's really going on is that there is a central — a central policy that promotes discrimination against women? Do you really think you have? We have testimony in the record from the vice president of the company that that policy was lip service at the company. We have testimony from the expert in this case. Isn't this something that would be — I mean, this — we're just talking about getting your foot in the door. We're talking about certifying the class. And you may well lose on every one of these points, but the 23A standards, they're not supposed to be very difficult to overcome. It's just a common question of law or fact. Not to dominate at that stage. But what seems to me is a very simple question. And I think that's a serious problem in this case, is how do you work out the back pay? You say, we get through the 23A threshold and we got a class certified under 23B-2. And the judge says, there's no way I could possibly try each of these individuals, so we're going to do it how? How are they going to calculate the back pay? Well, the approach that the district court endorsed, an approach we recommended and which has been endorsed by seven circuits over a period of 40 years, is in circumstances like here, which are admittedly the exception to the rule, where the company had no standards by which to make promotion and pay decisions. They had kept no records of who would be the reasons for people being promoted and the reasons why they paid people certain amounts, that as a consequence of that, the Albemarle decision and the Teamster decision made clear that the obligation of the district court, upon finding of liability, is to attempt to reconstruct the decisions that would have been made in the absence of discrimination. And the district court found here, and we submit it's not clearly erroneous, that the more reliable method for doing so is to use a formula relying on Wal-Mart's robust database in which it captures performance, seniority, and a host of other job-related variables, factors that bear on pay and promotion decisions, and permits a comparison, a very precise comparison, in a way that having individual hearings relying on hazy memories, post-hoc rationalizations, doesn't. Roberts, what if you had a situation where you had a company with a very clear policy in favor of equal treatment of men and women? You know, the answer to your question was women don't have as many positions because managers discriminate against them in hiring and in promotion. Yet, you still have the same subjective delegation system. Could you have a class of women who were harmed by this subjective policy, even though it was clear that the policy of the corporation favored equal employment opportunity? Well, I think if the as clear as your hypothetical suggests that the company had a policy of that sort, it would be inappropriate for it to seek summary judgment. No, no, no. They still, well, then you're saying it is not enough that it be a subjective decision. This company has a thousand stores, and sure enough, in a thousand stores you're going to be able to find a goodly number who aren't following the company's policy, who are exercising their subjective judgment in a way that violates the right to equal treatment. Couldn't you bring a class of people subjected to discrimination as a result of that subjective policy? You could bring a class case on behalf of, I understand your hypothetical, on behalf of women, I'm sorry, who were subject to discrimination as a consequence of that unchecked discretion. I want to be clear that we shouldn't lose sight of the fact that we have evidence here of results from this that are really extraordinary. Breyer. So is the common question of law or fact whether, given the training which central management knew, given the facts about what people say and how they behave, many of which central management knew, and given the results which central management knew or should have known, should central management under the law have withdrawn some of the subjective discretion in order to stop these results? That is a fair way to put it. All right. If that's a fair way to put it, is that a question that every one of the women in this class shares in common? I believe so, Justice Breyer, because they've all been the subject in every one of these stores to this very broad discretion. District judge didn't think so. Didn't the district judge say that in awarding back pay, some would get a windfall and others would be undercompensated? Actually, Justice Ginsburg, I think the district judge did not find that. What he found was that the formula, and I can assure you the formula we tend to use, is a regression analysis that would permit a comparison between each woman and the amount she was paid and similarly situated men, taking into account, as I said, performance and seniority and the like. And you will find that there are women who are not underpaid, and the formula will show that they should get no back pay. I think that the district court I thought his point was not simply that some women were not underpaid, but women, if you had an individual case, the employer might show this person would have been fired as disciplined and wasn't owed any back pay, not that she compares favorably to a male peer, but that she wouldn't have gotten any pay at all. Well, Justice Ginsburg, the kind of factors that enter into this economic model, performance in particular, should capture whether somebody should have been fired. That is a very important part of the model here that permits people to and we found the evidence shows that women were in fact had higher performance than men and were nonetheless still underpaid. Am I missing something here? Doesn't your class include both those women who were underpaid and both and those women who weren't underpaid? Doesn't your class include both? And is that commonality? As every class does, Justice Scalia, every class has some portion of its members who are not harmed by the discrimination. As the Teamsters case recognized, what is common about them is they were all subject to the same highly discretionary decision-making, even if some of them weren't harmed by it. That still presents a question common to the class. Mr. Sotomayor, if I'm wrong, I thought the Teamsters case was an action by the government. It wasn't a class action case. That is correct, but it is the paradigm we use for determining what you need to establish a pattern or practice of discrimination. A pattern or practice, that's correct. But help me, if you can, with this. Let's suppose that experts, testimonies, sociologists and so forth establish that in industry generally and in retail industry generally, women still are discriminated against by a mathematical factor of X. You have a company that has a very specific policy against discrimination. And you look at their employees, the way their employees are treated, and you find a disparity by that same mathematical factor X. Does that give you a cause of action? If the — I'm sorry, if the disparity was— The disparity that women are subjected to are the same in the company as they are society-wide. But the company does have a policy against discrimination. I would say that the company's responsibility under Title VII is to ensure its managers do not make pay and promotion decisions because of sex. If the comparison between the pay women receive, for instance, who are similarly situated to men within the company, is such that they are underpaid compared to similarly situated men in the company, then the company would have legal responsibility under Title VII, regardless of what happens in the rest of the industry, what happens in the rest of the world. Would that be true even if you could not show deliberate indifference? Well, I don't know that the — with all respect, that the standard is deliberate indifference. I think that under this Court's decision in Ellerth— Suppose there's no deliberate indifference and a specific policy prohibiting the discrimination. Can you still proceed? I would submit you still can proceed. If the policy — announcing a policy saying don't discriminate were to be effective in immunizing companies against liability in class actions, imagine every company in the country would publish that policy and have free license to go discriminate as much as it wanted. I understand your answer to Justice Kennedy's question to be that this typical company would be in violation of Title VII. Is that correct? That is correct. That's what the — and that's what the academic literature on which your theory is based includes, isn't that right, too? With — Justice Alito, I think it's not just academic literature. I think it's the precedence from this Court. I think that's the premise behind Teamsters, that the — you look to — and Hazelwood, which makes very clear that you don't look to populations outside the company in making comparisons. So you have a company that is absolutely typical of the entire American workforce. And let's say every single — there weren't any variations. Every single company had exactly the same profile, then you would say every single  That could very well be the case. If the — I think that Title VII holds companies responsible for the actions they take with respect to their employees. There certainly are industries, and there were 30 years, many more, 30 or 40 years ago when Teamsters was decided, where the entire industry might have had evidence of discrimination. That would not — there is not a negligent standard under this statute that immunizes companies because they follow the same standards as other companies. Scalia, what your answer assumes is that if there is a disparity between the advancement of women and the advancement of men, it can only be attributed to sex discrimination and other factors. Well, otherwise, how could you say that all of the companies are presumptively engaging in sex discrimination? Well, Justice Scalia, I want to deal with the — in this instance, we have — it's We have statistical regression analysis that isolates and takes into account the factors such as performance and seniority. I wasn't talking about this case. I was talking about your answer to Justice Alito. I'm sorry. Which said that, you know, yes, it may well be that every industry in the United States is guilty of sex discrimination. Well, I — Unless there, you know, there is equality of promotion for men and women. No, I don't take that position, Justice Scalia. What I was trying to make clear is that the fact that there are other companies in the same industry where the same problems may arise, which, by the way, wasn't true here where Walmart was behind the other large retailers, doesn't mean that a company is any less liable for the discrimination practiced in its own workplace. I can't speak for the rest of society. I don't have any reason to think the entire society is engaging in employment discrimination. Counsel —  Yes. And ask when you think it is that individualized hearings are required. You've described a kind of formula that you would use. When is the formula approach right, and when is the individual hearings approach right? Well, I think it's a call that, of course, we leave — we should leave to the district court in the first instance. But factors that could weigh in the balance would include whether or not you have available the kind of information that we do here from database with which to be able to more reliably construct the kinds of decisions that would have been made in the absence of discrimination. Likewise, there may be companies where they have better records or kept any records or have more substantial standards that would permit the reconstruction of those decisions through individual hearings. I don't think this is something that — I'm not contending that under — that you could always use a formulaic approach in connection with these cases. This is an extraordinary case with evidence that is — that they have kept really no standards and no records. I thought, didn't the district judge say because of the numbers we couldn't — couldn't possibly have a hearing in each case on whether the particular woman was owed back pay? Didn't say something about that. The district — I'm sorry, the district court did make the comment that the sheer number of class members would make the administration of individual hearings difficult. But the district court went on, very importantly — Ginsburg I thought he said impossible. Waxman Sorry? Ginsburg I thought he said more than difficult. Waxman Well, he may have said impossible, but the important point is that he went — the district court went ahead and made specific findings about the extent to which the particular record here shows that the use of a formula would be more reliable than individualized hearings. Sotomayor Counsel, I'm a little confused. Waxman Okay. Sotomayor All right? Because you're saying an individualized hearing is impossible, but that's exactly what you're saying you're going to do, only through statistics. You're going to say, through my statistical model, I will be able to identify those women in the class who are deserving of pay raises. What that doesn't answer is, when in this process is the defendant going to be given an opportunity to defend against that finding?  Right. Sotomayor Because you're — are you suggesting that the district court would appropriately bar a defendant where there's no proof of intentionality with respect to not keeping records, that it was intended to stop these women from collecting money, et cetera? When are they going to get a chance? And if they're going to get a chance, isn't that an individualized hearing? Waxman Yes. Effectively, Wal-Mart will have ample opportunity through the arguments over which variables to use. There was a very robust debate below already about which variables to use that will have a significant impact on whether women are shown to be underpaid or underpromoted compared to men. So Wal-Mart will have that opportunity. And frankly, if — Sotomayor No, no, no. That sounds like you're saying their only opportunity will be on the model. They won't be precluded from attempting to show any individual evidence that a particular decision was not made. Waxman Wal-Mart — if Wal-Mart, Justice Sotomayor, if Wal-Mart comes forward below and it hasn't done so so far, is able to persuade the district court that it can, consistent with some kind of — in a way that's consistent with a reliable determination of who should have been paid what and promoted in the absence of discrimination. Sotomayor You're not answering me. Waxman I'm trying to. Sotomayor What you're saying is we're going to preclude them from doing anything but offering a mathematical model, because otherwise it's going to be too hard to have individual hearings. Waxman I'm — let me answer you directly. I'm not saying that. Wal-Mart has an opportunity to make the case that with whatever showing it wishes to make, it can reconstruct these decisions more reliably in an entirely subjective environment. And if it does, it can offer evidence in certain circumstances, but it hasn't done so. And I don't submit it's going to be able to do so here. Scalia This takes evidence to establish that it's more reliable to have a hearing with evidence on the particular promotion or dismissal of the individual, that that is more reliable than using, I don't care how admirable a statistical guess you make. I mean, is that really a question? Waxman I think it is, Justice Scalia, because the — Scalia Well, I think it's not the judicial system. It's the recordkeeping of the company and the standardlessness of its — of the pay and promotion processes that basically mean 10 years later, these managers are going to be coming forward to speculate about what they did 10 years earlier with no records to cross-examine them on. That is not the model for a reliable adjudication. Roberts We should use that in jury trials, too, for really old cases. We should just put a statistical model before the jury and say, you know, this stuff is too old, so we'll do it on the basis of — is this really due process? Waxman I — Justice Scalia, I submit it is. And the circuits that have been considering this for 4 years have so held, in the narrow set of circumstances that we have here, where there are standardless, recordless decisions at issue. Kennedy Well, if it's standardless and recordless, then why is there commonality? It seems to me that what you — your answer that you just gave really is a — shows a flaw in your case on commonality. Waxman No. Justice Kennedy, the — the standardless and recordless aspect is with respect to trying to reconstruct these decisions years later. As I said before, we have a common policy here. It presents a common question. We've shown evidence that would probably create a prima facie case of a pattern of practice under Teamsters. And we think we've satisfied the three components of commonality that we think need to be addressed. Ginsburg One thing you haven't touched on is to have — first of all, the question of whether B-2 is limited to injunction and declaratory relief. But if you follow the advisory committee's note, then if damages predominates — if damages predominate, then you can't use B-2. You have to make your case under B-3. And one factor here is that about half the class is gone. So they're not interested in injunctive relief, but everybody is interested in money. So why doesn't the money — why do you say that the — that the injunction — injunctive relief is the thing and the damages are lesser, rather than the other way around? Well, the — In fact, it's more than half the class that's gone, isn't it? Well, I don't — nobody knows that, but because they continue to have more employees adding — added at the company, so I wouldn't presume that's the case. So the question is, why is everybody leaving? Well, there are people leaving. But the point — but more importantly, the advisory committee note on — with respect to Rule 23b-2 makes clear that there is a — that the — whether or not an action or inaction is taken with respect to the class, which is the predicate to B-2 certification, it depends on — doesn't depend on the number of people who are adversely affected by that action. And so, as a consequence, whether former employees are — if they're — they would be included within the class under B-2, because that — the question is not, on a day-to-day basis, who should have been in a position to seek injunctive relief and who's employed and who's not. Thank you, counsel. Thank you. Mr. Boutros, you have 4 minutes remaining. Thank you, Mr. Chief Justice. Let me begin with this question of back pay, because Mr. Sellers has made clear, under their vision, Wal-Mart would never have an opportunity to prove that it didn't discriminate against a woman who was seeking back pay. And the district court did not suggest that it might be difficult, as Mr. Sellers suggested. The district court, as Justice Ginsburg suggested, said that he found it would be impossible, not just because of the number of people, but because of the nature of the claims, that discretionary decisions were being implemented in a way that affected different people differently. The problem here, Mr. Sellers says, is that the records are not available. Then he says, we're going to have a proceeding where the district judge relies only on the records that he says are inadequate to allow reconstruction of the decisions. That is not a process known to our jurisprudence. It doesn't comport with due process. It takes away Wal-Mart's rights under Title VII. It injures the rights of the individual women whose the record doesn't. Sotomayor, you don't seriously contend that if a plaintiff, if a policy were found or practice of discrimination, that a woman couldn't come in and say, they put X in, I had a longer history at Wal-Mart, I had far superior job ratings, I had no criticisms of my work, and I wasn't promoted. Wouldn't that be enough for her to show that that policy influenced her lack of selection? I agree with you, Justice Sotomayor. And your personal database has all that information. So why is it impossible to try these cases other than because of their large number? That's a different issue. Yes, Your Honor. What you just outlined, we agree that a woman should be able to come in and say that. And she may say, well, the records don't show what really happened. I had more experience. I was a much better employee than the guy working next to me. Under the plaintiff's theory, in order to get a class here, they've thrown that out the window. That woman would not be able to come and testify. Wal-Mart wouldn't be able to say, this person was a terrible employee, this person was a great employee. On the record, it's not impossible to recreate these decisions. The record is filled with declarations from managers who remember very well that Ms. Dukes violated company policy, that Ms. Arana was fired for infractions regarding how she kept her hours. If you just spend one second, remember my question, we've got a common issue. Why isn't that enough at least to support a B-2 injunctive action? Your Honor, the scenario you outlined, there's no dispute about the policies that existed at the time, that there were. That sounds like the merit you're getting to. His point, remember, is this is just certification. So my question is, assuming they can support it with evidence, why can't they have their B-2 class at least on an injunctive? Because, Your Honor, the common policy is one that affects everyone differently by definition. Therefore, these plaintiffs are not typical, and they are not arguing that everyone was affected the same way by the common policy. Many women were fribed. Maybe some men stereotyped or some women stereotyped the other direction. 544 of the plaintiffs are female store managers. So it's impossible to make these sweeping generalizations, which of course is what stereotyping is supposed to prevent. And so it's – there's absolutely no way there can be a fair process here. On the policy question, the policy – the plaintiffs point to the general policies in the central control, but the one policy they do not want to confront is the policy against discrimination. It was not just a written policy on paper. In fact, there's a declaration at page 1576 of the Joint Appendix that lays out the very aggressive efforts the company had taken. Scalia, what about that Vice President who said it was just window dressing or something like that? I'm glad you asked about that, Justice Scalia. Here's what he said. He testified about the diversity goals of the company at the time, the effort to get more women into management. And he said in his view, until the company linked diversity goals to compensation of managers, it would be lip service. He wasn't saying the whole program was lip service. He was one of the advocates for diversity in the company. He wanted it to be more aggressive. He said his goals were 20 percent and other people's were 10. So it's completely misleading to suggest he was denigrating the entire policy. Sotomayor, I think he's just making their point, which is if they started paying women the same as men, they might get more diversity. They do pay the same as men, Your Honor. Well, that's the whole issue that's in dispute. Thank you. Thank you, counsel. The case is submitted.